Good morning, Your Honors. Janet Tung from the Federal Defenders of San Diego here on behalf of Mr. Zitlalpopoca. I've seen you before, haven't I? Yes, Your Honor. I've appeared before you a number of times. Oh. I don't know who this guy is. Smiles all the time. Okay. All right. Your Honors, this is a textbook case of prosecutorial overcharging. There's no question that there was prostitution here, and there's no question there was importation of prostitutes. But Mr. Zitlalpopoca is not guilty of forcible sex trafficking, as that's defined under Section 1591. To be guilty and properly convicted under Section 1591, one has to employ actual or threatened force, fraud or coercion, and those means have to be what actually causes the woman to engage in prostitution. You know, I'm sympathetic to your argument. And when I first saw this case, and I've not had one of these cases in quite this form before. I've seen the ones where it's much more obvious. It's, you know, the slave trafficking and so on, the sort of case we're about to see, the white slave stuff. Well, this guy's an ordinary pimp. Does 1591 reach ordinary pimps? Where there's no force, fraud or coercion like here, no, Your Honor. Well, an ordinary pimp is in some, you know, psychological coercion and so on. Most pimp stories, maybe all pimp stories involve some form of coercion, some sort of abuse and so on. And I'm trying to figure out, is 1591 just a pimp statute? No, Your Honor. There's a number of statutes that cover pimp-type behavior, and some of which he's convicted under. Section 8 U.S.C. 1328, importation of prostitutes. He's convicted of that. There's Section 2422. He's convicted, you know, correctly as to one of the women, but not as to the other. Section 2421 covers transportation of prostitutes. But let me just address, Judge Fletcher, your question about whether this covers ordinary pimp statutes. The answer is no, and Congress has told us that in the legislative history. Of Section 1591, they told us that this sex trafficking by forced fraud or coercion is a level higher, and it's so serious, we're going to impose a 15-year mandatory minimum sentence on it. Does that mean that our decision in Todd is wrong? No. Because the behavior in Todd, he wasn't a very nice pimp, but he was a pimp. One way in which I don't – I think what Your Honor said, that Mr. Zalapopoca is like an ordinary pimp. And I only partly agree with you. I don't think that's actually true because he's not comparable to somebody like Todd. What we're used to seeing in the United States is, particularly in inner city areas such as where Todd is from, is pimp behavior has become this sort of affair where there's an – there's an elaborate set of prostitution rules. And they enforce through – this is a known set of rules. The prostitution – the prostitutes all know what the rules are, and the pimps all know what the rules are. And they enforce through violence. You can see that in Todd. You can see that there's a case out of the 11th Circuit called United States v. Pipkin. It's from 2004 where they get even further into the details of ordinary pimp behavior. They have videos that show how you're supposed to behave. And the difference – the biggest difference between this case and United States v. Todd – Do you want to speak into the microphone? I'm sorry, Your Honor. All right. The biggest difference between this case and United States v. Todd is that Todd had this elaborate set of pimp rules that is typical of this type of forcible behavior, forcible and coercive behavior. And every time the women deviated in Todd from his set of rules, he would beat them violently, and they knew that that was why they were being punished. They were punished for not abiding by his rules. He had control over them, over their money, and they had no autonomy. In this case, these are the biggest places where Mr. Zitlapopoca doesn't have a set of pimp rules. These women have autonomy. They have become prostitutes over the course of years before this alleged offense occurs in the United States. And over the course of those years, they have developed their own autonomy. Each woman has had long periods, months and years, for both women where they were living on their own, working as prostitutes without any or much involvement. For Mr. Zitlapopoca, they went out and got their own clients. They went out and made arrangements on how to be paid. They went and did their work. They got the money. They were paid, and they decided what to do with the money. They decided how much to spend on their own needs, clothes, makeup, how much to send home to their families, and how much to send back home to him. I know you know this language, but let me just read it to you, which is why I'm having trouble. This is actually a difficult case for me because I'm trying to figure out, is it just any ordinary pimp? The term serious harm means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background, same circumstances, to perform or continue performing commercial sexual activity in order to avoid incurring that harm. So psychological harm, if someone is psychologically dependent, I mean, if we're talking Stockholm Syndrome, at some point you don't need to beat them anymore. They're just there. I mean, what kind of psychological stuff are we talking about? Because I can see that what your client is accused of doing could fit within this definition. That's where I disagree with you, Your Honor. I think if there were a case of Stockholm Syndrome, for example, the statute may cover that. There's no ‑‑ but the difference between a case like that and a case like this is, first of all ‑‑ But the Stockholm Syndrome is identifying with the captor, even loving the captor and so on. A Stockholm Syndrome, there doesn't need to be any beating at all. But, Your Honor, there was no evidence of anything of that effect at all. There was no expert testimony that any sort of coercive atmosphere had been created. In fact, the government attorney at trial, they had an expert lined up. They gave expert notice. They had that person ready to testify. And then they elected not to use that expert. They didn't have the evidence that we're talking about right now was not presented at all at trial. We don't know what that expert was going to say. We don't know if they, you know, in fact the expert, the evidence would not have held up. Now, the other thing that makes this case, you know, very much different is ‑‑ or I'm sorry, the other point I'd like to make about that definition of serious harm that you just read is that ‑‑ these women basically become slaves. No, Your Honor. Yeah. I disagree. Yeah. Your Honor, the women have testified that they fell in love with Mr. Zitlal Popoca and that they continued working as prostitutes because they loved him. Well, that's part of it. If the case is going to be ‑‑ It's like the battered wife syndrome. Again, there's no evidence of it. And for Ms. Calixto, she was ‑‑ he was violent with her. He was violent with her two times in 2005. This case is charged for an offense that begins in 2008. So he was violent with her twice, and then she told him to stop. You know, I'm getting older, so you have to speak a little more slowly and project your voice. Ms. Calixto ‑‑ Can we turn the mic up just a little? Okay. Yeah. I'm sorry, Your Honor. Ms. Calixto was on ‑‑ had a ‑‑ was absolutely not powerless in this relationship. She told Mr. Zitlal Popoca, stop hitting me. In 2005, she said that. And after that point, he never hit her again. Well, how did they meet? How did they meet? They met in a bus station. She was in a bus station, and she was supposed to meet her boyfriend there, and he didn't show up, and she was at risk of spending the night in the bus station. He said, come home. She was destitute, too, wasn't she? She was young, and she was poor. She was young, and she was poor. Okay. And where was she from? She was from a farm working family. I think Papantla is the name of the town that she was from. Where? I think it's coastal Mexico. I might be wrong, but it's ‑‑ Where? I think it might be coastal Mexico, but I might be wrong about that. All right. So there she was. How old was she? She was 17 at the time they met. At the time this offense was charged in 2008, she was in her early 20s, and she had been working as a prostitute and making quite a bit of money as a prostitute for three years before this offense was charged. Who got her into that business? Mr. Zitlal Popoca introduced her into this business. Now, if the theory ‑‑ and this is the theory that the government went on at trial, which is these women were so susceptible to the attention of ‑‑ they're so dependent and so helpless in the face of being in love with a man that they are slaves to the heart. And that effectively ‑‑ I mean, that is what the government's theory was at trial, and that is what section 1591. I refuse to believe that Congress looked at women and felt that they were so helpless and so dependent that simply saying, if you love me, you will do it, is enough to amount to forcible sex trafficking. What is the definition, say? The definition of forcible sex trafficking, Judge Fletcher read part of it. Yeah, yeah. It's force, fraud, or coercion. What? It's force, fraud, or coercion. And coercion means it's a serious harm, a threat of a serious harm, which includes a psychological harm. But the portion of that definition, I think, is crucial. Well, read the rest of it. Read the rest of the definition. Of serious harm. Huh? Which part? I don't have it in front of me right now. The serious harm portion? The term serious harm means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm. And that's actually exactly my point, is that second half of the definition of serious harm imports an objectivity standard to this test. So we have to be able to look at women, if we want to go a step further, we can say we can look at Mexican women and say, is a woman who has fallen in love with a man and maintained a relationship with this man, has she become, has she gotten to the point where she is compelled? In other words, her activity is involuntary because she's so in love with him, has she become this slave to her heart that heartbreak will compel her against her will to perform these sex acts? And it's my view that the answer to that is no, that Congress couldn't possibly have meant to look at women and say women can't act volitionally after they have fallen in love with a man, even if it happens when they're 17 or in the case of Ms. Dela Cruz, she was 19 and in college when she met Mr. Zillow. This is when they're young, they're destitute, they have no one around, and these guys are out there preying on them, they're nice to them, they take care of them, then they start dominating them and beating them up and pushing them into prostitution. And they still have nowhere to go, they suffer a lot of humiliation, but on the other hand, the pimps are nice to them at times, they get them nice clothes and all the rest of it. So that's just part of this syndrome. They become their slaves, and the slaves know no other life than the kindness of the pimps. That's the way it works, and we've got a serious problem with this. It's going on all over the world today. Your Honor, it's not a good thing. We're bringing in women into this country from other places. It's not a good thing. In the case of Ms. Calixto, but in the case of Ms. Calixto, there's a completely different relation, and Ms. Dela Cruz, there's a different relationship than what Your Honor just described. Ms. Calixto was living in Mexico prior to the charged period. She was living in Mexico for months, not working as a prostitute, and she was in telephone contact with Mr. de la Popoca, and he told her, I want you to stop working and stay not working. And she called him and said, I want to come to the United States. And he said, no, I don't want you to come. I want you to stay here and not work. And she kept persisting with him, and she knew what she was getting into, and that's what she did. She called and called and called him until he said, okay, I will help you make the financial arrangements to come, or the smuggling arrangements to come to the United States. And that's not somebody who's enslaved. She was more or less on, she was on, I'm not going to say equal footing, but she was not powerless, and this was a real relationship these two people had. With Ms. de la Cruz, there's also, she was not a slave. She knew that she could leave him, and she, in fact, did leave him. She left him three times and came back. She left him in Mexico twice, and actually in the United States. She went to the trolley station. She went there without telling him, and then she gets to the trolley station, and she realizes she borrowed somebody else's telephone and called him and said, Adrian, can you come bring me my cell phone? I forgot to bring my cell phone. I dropped my handkerchief. Right. Meaning, I dropped my handkerchief, so maybe you'd come and get me. Right, right. And then he came, and when he came, he wasn't threatening her with force or physical restraints or anything like that. He came and he said, here's your cell phone. I'd like you to get in the car. She said no, and he drove off, and then there's yet another telephone conversation where he says, I'm going to come by, and if you want to come, get in my car, and if you don't, you may leave. Both women knew that they could leave. Can I ask a question here? On the definition of serious harm, I'm open to the possibility that there was psychological harm here, but it has to be more than just psychological harm. It has to be psychological harm that's so serious to compel, right? Isn't that the strongest part of the argument, that even if there's psychological harm, it didn't compel these women to engage in the prostitution? That's exactly right, Judge Bennett. It has to compel these women to do it, and Congress has given us just a little more insight about what that compelling meant. In the course of passing 1591, they said this is so serious that trafficking contains all the elements of forcible rape, as we understand it. And the evidence of compulsion here, or the compel part, is virtually nonexistent? It's virtually nonexistent. It's very thin. It's nonexistent, I agree. In all the testimony that comes out, the women say, I did this because I was in love with him and I wanted him to stay and not leave. And I think that one of the most telling pieces of testimony is, Ms. Calixto is asked about, the women have an interaction with, I think it's like a rescue-type organization after they're arrested. And she's asked on the stand about her interaction with this rescue organization called BSEC. And she says, you know, you told the people at the BSEC you weren't forced to be a prostitute. And, you know, she's agreeing to what she says. Then they asked you, why were you here? And what she said in response was, I don't know. I wasn't forced to be a prostitute. But if she did it out of love, and love can be considered maybe psychological, if she was compelled to do it out of her love, does that qualify? It seems bizarre that it would qualify as serious harm, but we have to go with the definition in the statutory scheme. I think that's a great point. Love is certainly psychological. But as Your Honor said, it doesn't – I mean, the point you made is it has to compel the woman to act in this particular way. Not just this woman, but a reasonable woman acting in their circumstances. It's just got to be so much that a woman would feel like she was powerless. So doesn't this get back to Judge Fletcher's opening question about isn't this just ordinary pimping activity? It's certainly no more than ordinary pimping activity. It's not forced fraud or coercion. And the point – one more point that I'd like to make about this. Love is coercionary. Well, what about – what about – was there any inducement here? Any temptation, arousing hope or desire? All of those fall within that dictionary definition of persuade. And this is the Allenstein case. Do you mean – is this on the second argument, the section 24? No. It's U.S. v. Raskowski. Okay. And, Your Honor, this is concerning the second argument, that there was no – Who persuaded whom? Right. Exactly. Yeah. I think that's – I mean, I think that's right. The government says that Ms. – or Mr. Zitlalpapoka persuaded her to come to the United States. But the evidence shows the opposite. She – and the evidence is undisputed. She called and said, you know, may I come? He says no. May I come? No. May I come? No. May I come? Yes. And for us to consider that to be persuasion, inducement, enticement or coercion, that's completely counter to sort of any definition I can think of of those words. In order to be the guilty party who's persuading, enticing, inducing or coercing, prior to the interaction you have with the other person, you have to formulate that desire in her head. That's what Raskowski says. It says as long as the defendant has that desire in his head, it doesn't matter that the other person also has the desire in their head. He's still producing, enticing or, you know, coercing or whatever the other term is. And in this case, Zitlalpapoka is the opposite. He has the opposite desire. He does not want Ms. Colixo to come. And, you know, the way I thought about it was with – I have a 3-year-old. And if my 3-year-old daughter said to me, Mom, I'd like to go to the zoo. No, no, I don't want to go to the zoo. Yes, zoo. No, zoo. I don't want to take her to the zoo. Finally, she wears me down and I say, okay, fine, I'll take you to the zoo. And since you're 3, I'll drive the car and I'll pay for your admission to the zoo. In no sense of those words have I persuaded, enticed, induced or coerced her to go to the zoo. I didn't want to go. It was reluctant. Well, there was some competition, wasn't there, between the two women? I think that could be inferred that after they arrived in the United States, there was competition between them. That's probably why you said you didn't want her to come. Didn't your daughter coerce you? She's too young to be tried. Or she's a master psychologist. All right. We'll hear from you about that one. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. Mark Rahe for the United States. Your Honor, the government's position in this case is that to be liable under 1591, it doesn't have to be an all or nothing proposition. My opponent made a lot of hay about the fact that maybe at certain times of their association with the defendant, these victims testified that they had feelings for him. One at one point said, you didn't have to put a gun to my head. But I'm not aware of any interpretation of the law that says at all times did the victims have to feel a certain way. And, in fact, the only precedential authority out of this circuit in this field covering this statute, Todd, had victims with much the same kind of story. There were three victims in that case. All three of them started out consensually committing acts of prostitution for the defendant in that case. But they did get beaten, right? At some point they did. But they weren't beaten all the time. I admit that's an easier case. If we had had something like that here. You know, if you're right, if this is what 1591 means, get ready. You're going to be the local vice squad. I mean, every pimp in Los Angeles can be prosecuted under this theory. Well, Your Honor, I understand. Well, go for it. I mean, the federal government hasn't done that enough to do. Right. Well, obviously, I think when this statute was enacted 10 years ago, I mean, if your concerns are true, then that should go to the legislature. All we're here is to enforce the law as it's written. This is a statute. Congress is concerned. In your brief, you wrote it as if the behavior prior to coming to the United States was relevant to the determination as to whether or not there was force, fraud, or coercion. Absolutely. Why is that so when the statute says will be used rather than has been used, and the indictment period coincides with the arrival in the United States? This is my understanding, Your Honor. It does say will be used, but this is a backward-looking exercise. This is a most emotional exercise. Will be is not backward. Will be is what will happen in the future, and the beginning date of the charge is when these two women come into the United States. So why are you looking as to what happened before they came into the United States? Because it's relevant to the issue of coercion. In what way? Okay. The statute defines coercion broadly. We've already talked about serious harm. It uses the phrase any scheme, plan, or pattern. Right. With all due respect, Your Honor, these cases, a lot of them, what if somebody in Ukraine says, you know what, unless you go to America, I'll kill everybody in your family in this village, and then that person gets to America, commits acts of prostitution, there will be some instances that forced fraud or coercion was initiated prior to the charging date, but there's no question that it then caused the sex act within the dates charged in the offense. I got that. So I think you and I then may be on the same page. It's possible that we have to look back to the behavior in Mexico in order to understand the coercion that takes place after they get to the United States. But the coercion has to take place in the United States. We agree that it's continuing. It doesn't just – No, I don't say that it's continuing. I do not agree with that. I think the coercion has to take place after they come to the United States, and in order to understand what is coercive, it may well be relevant what happened before. But the coercion has to happen after they come to the United States. Exactly. And you know what, look, I'm not saying Todd was wrongly decided. I'm not trying to create any conflict with that. What we're saying is coercion is defined as a pattern. This defendant is not just an ordinary pimp. He has a systematic means that he duplicated with both of these – A particularly gentle pimp, as a matter of fact. I disagree. And I'll get to that in a second. It's Blake. You only hear half the story whenever you read the defense brief about, oh, how much they loved him. Well, you know, I read your brief too. I appreciate it. Well, then, Ian, I'm here to make my case. Excerpt of Record 166, they asked Ms. De La Cruz, was the defendant ever angry with you? Yes. Was that frequently or very frequently? Very frequently. Just two months into that relationship, in September of 2006, he beats her up because she finds condoms in his wallet. In Excerpt of Record 164, she testifies that she decided to never challenge him again because she was very scared of him. And she described that as a turning point in their relationship. Between July 2006 and January 2007, she once tried to keep the money. My opponent makes it sound like these women are independent contractors just choosing this as a profession. She decides to keep the money. The defendant gets angry. And what's the nature of the relationship after they come to the United States? I would say it's the same as it was before. And if what it was before amounts to coercion, then what it was after is also coercion. Now, is there any beating once they get to the United States? There's no evidence of that in the record. And is there any evidence that he is resisting them leaving once they get to the United States? I don't know if there's per se evidence of that. There's that one story about her forgetting the cell phone, and then as soon as she comes in, the child, oh, I knew you'd never leave me again. I love you. And this is great. From the man who's beaten her three times before, who the record showed in the year leading up to when she came to the United States, hit her several times, one time with the cable, one time with the broomstick. Right before they came to the United States, the defendant told Ms. Dela Cruz, a friend of mine who's a pimp is looking for a woman who called the police on him because they want to beat her or kill her. Ms. Dela Cruz testified that she would never call the police on the defendant because of that. I know this is tough. This statute has a temporal scope. The reason I brought all that up in the brief is to say this is the scheme, plan, or pattern. This defendant is so good, he can set a clock. It's like a grandfather clock that chimes every hour on the hour with the tune. If he builds the machine properly, he knows. I think I've persuaded you or maybe you've persuaded yourself to make a somewhat different argument than I read in your brief. As I read your brief, you were saying that we simply got to look at what happened in Mexico, and if that was coercion, that was guilt under 1591. I think you're no longer saying that. Well, that's not my intent. My intent was what happened in Mexico still has to cause that commercial sex act during the time charging the driver. Oh, you say, well, then you and I are in a disagreement. I think the coercion has to be after they come into the United States. That's what will be used means, right? If I am somebody that this record shows in Mexico for two years, I find these young women when they're 17 or 18, I send them to my family's home, I tell them don't talk to anybody, don't use the phone. I go away, I leave them alone. Tells her the first day he met her, he wanted to marry her. Yeah, exactly. Within 24 hours, introducing both of these women as his wife and then leaving them alone. But isn't that extraterritorial application of the statute? I mean, I think the stuff in Mexico is relevant and admissible on whether there is serious harm in the United States. But the jury, I'm going to throw this out there, but it doesn't seem to me that they were properly instructed on the dates. And you had that discussion with the trial court judge, and I think the defense wanted to change the instructions, and he said, hey, this case has been around here too long. We can't change the instructions now. So you threw in the indictment, and they got the date of the indictments. But the jury was never instructed on how they could consider the Mexican evidence, and they could have convicted the defendant in this case based solely on the Mexican evidence and found that to be the coercion, and that's really troubling. Well, I would disagree, Your Honor. Why don't you take each one of these victims separately? Absolutely. As witnessed, Ayla Cruz, they meet in March 2006, takes her to his family home, isolates her, says, if you love me, you'll commit acts of prostitution for me. After a month of that isolation, she gives in. September 2006, just a few months into the relationship, he beats her. You're talking about? Ms. Ayla Cruz. Talking about Annabelle. Correct. All right. And then there's always a cause and effect to these things. It's the first act of violence. She testifies she immediately is scared of him and doesn't ever want to confront him again. And she tries to keep the money. He gets mad. I know Judge Fetcher, you asked at one point, oh, didn't the defendant let them go? At one point, the defendant toys with Ms. Ayla Cruz and says, you know what, if you want to go, go ahead. Just meet me on a flight. Maybe it was Mexico City. He's waiting for her at the airport. I lied to you. This is still in Mexico, right? Correct. This is going forward. And then act of violence, too. In January of 2007, she simply talks to another woman at a party. He gets upset, beats her at the party. Why don't you enunciate each word and speak slower? I apologize, Your Honor. I'm getting kind of amped up here. In January of 2007, it's the second act of violence. It hasn't even been one year since they first met. And then the third act of violence occurs around the same time. She throws corn on the cob out the car window. He makes her go back and pick it up with her mouth. Acts of humiliation designed to create a scheme, plan, or pattern of coercion. April 2007 to March 2008, the exact year right before Ms. Ayla Cruz comes to America, Excerpt of Record 171, the defendant continued to hit her several times. Sometimes he used a cable. Sometimes he used a broomstick. And at the same time, the defendant told Ms. Ayla Cruz a story about a pimp friend of hers who was looking for one of his prostitutes who called the police on him in order to beat her a killer. And then they come to America. Can we just forget all of this? What this defendant has done is he's created his plan, scheme, or coercion that he knows will continue to pay dividends in the United States. And the other thing is, as to Ms. Ayla Cruz, there's perhaps a simple way to get around this. Financial harm. As Judge Bennett pointed out, the statutory definition of serious harm, Congress has said physical or nonphysical, psychological includes financial. Adrian paid her passage across, and Ms. Calixto testified that that was at least $1,000. Here's a woman who has no papers to be in the United States, is told she has to pay back this smuggling fee. She can't go get an honest job. She continues, I think. She has to pay back what he paid the party that transported her. The smuggler, exactly. Both of them over here. Correct. Yeah. And he said that he got the money from some relative. Correct. He's got to pay the relative back. So she's obligated, she's obligated to go out and work as a prostitute and make the money so he can pay back the coyote that brought him across. And what I stand before you to say now is to remind, like, what's our posture here? A sufficiency review, where we review the evidence in the light most favorable. It may be a closed case. It may not. But I think a jury was within its rights to infer, even putting aside all the violence that happened, if you want to say that only happened in Mexico, here's the financial harm. I'm not making that up. I'm just trying to figure out what happened. The violence took place only in Mexico. So what do you mean, if I want to say that? Exactly. And the reason I fight that in the brief is because then it's not like they come to America and Adrian says, oh, hey, I'm going to go serve. You guys can do what you want to do. No, no, I got that point. I understand. Your argument is that when he said to her, you've got to go out and make this $5,000 so I can pay it back, so he put pressure on her then. Exactly. And I know that's the coercion. As defined in the statute, which says includes financial harm. Yeah. Can I get to a point on restitution? Who decided how much to award on restitution? Was it the judge or was it the jury? The judge. The judge. Given that the statute says will be used and it really applies prospectively from the date of entry to the United States, which is how can you justify restitution for the period in Mexico? Well, Your Honor, again, I think because it has that disgorgement proviso. The way the 1593. . . It's the engorgement during the period of the offense. Actually, the statute doesn't limit it to the temporal time. What the statute, 1593, says the victim's losses include the same definition as is in 2259b-3, and that says losses proximately caused by the offense. The offense. Okay, that's the offense that's being prosecuted. This is 1593 says that's the term losses to the victims includes that and shall in addition include wrongful sums, you know, the value of the victim's labor. Our argument is. . . During the period of the offense. Well, it doesn't go on to say that. In effect, in 2259. . . So you're saying benefit to him, you can get money for a period long preceding the period of the offense? Is that what your argument is as to why the restitution? I mean, I think it has to be because that's what happened, Your Honor. Yeah. No, I'm asking you not to say what happened. I'm asking you to define what's available for restitution in the sense of benefit to the defendant. You're saying benefit to the defendant can be a period preceding the offense. But I don't mean as a benefit to the defendant. The way TVPA defines restitution in 1593, it includes not only the losses approximately caused by the offense, but shall in addition include unjust enrichment. I know, but I'm asking you, and you're saying the unjust enrichment includes unjust enrichment in a period prior to the offense. Correct, Your Honor. And the reason I say that. . . Where's that coming from? Well, the one thing is coming from the absence of a temporal caveat, which is set forth in 2259b-3. What was the point of going into all that for? Into going into what, Your Honor? Why were you looking for reparations? Well. . . Did he have any money? The restitution comes forth. Yeah, did he have any money? I believe he does from all these years of pimping. Well, how do you know that? Look, this issue is litigated below, Your Honor. The defense has no qualms with the calculation of the restitution. It's only about the scope. I wasn't the trial lawyer. I reviewed the record. This defendant said I'm not going to revoke my Fifth Amendment rights when I talk to my probation officer and talk about all the money I had. So I think the ship may be sailed on that argument. But as I stand here, I don't have any ledgers. He didn't file any tax returns. The reason I raise this is not just with respect to the definition of period during which restitution is appropriate, but it's because it seems to me this whole case has confused the period of the offense. And I wish we had had an appeal of the jury instruction, which we don't. But it strikes me as very likely that the jury thought that the coercion that took place in Mexico was relevant in and of itself, not just relevant in terms of figuring out the psychological state after the arrival in the United States. That's my concern about where I think this case might have gone wrong. But I'm having trouble getting there because there was no objection that I can see as cognizable in the district court of the jury instruction and there's no appeal to us on the jury instruction. That's correct, Your Honor. And when all this evidence came out at trial about all the things that happened in Mexico, the very experienced counsel on the other side, was there ever one objection for relevance to all of that testimony? No. So the government's position, I know I won't repeat it, you know, oh, but if ‑‑ I'll submit obviously there was the one question about Rashkovsky, that account, too, about the enticement. If I might. I think you guys are just as wrong as to click so. I mean, she did not ‑‑ she was not persuaded to come. She persuaded him to allow her to come. If I ‑‑ I just want to read one quote from Rashkovsky itself. I was on the panel. I know the case. Yeah. I'll read that, too. Well, then I'll see. What are the acts that 2422 hits? It doesn't just hit inducement. Enticement's in there. What Rashkovsky said is that ‑‑ On Annabelle, on Annabelle, the coercion was to repay the costs of transportation. That was enough to allege coercion for involuntary servitude. That's one of our theories, yes. What? That's one of our theories, yes. Okay. So you got that. And that's the Mussory case, right? Correct. Now, what about Florenza? I think you got a weak case there. I won't deny that, Your Honor, that it's weaker when compared to Annabelle. What? It's weaker when compared to Annabelle. But my position is it's still sufficient under the deferential review that governs on sufficiency of the evidence challenges. Well, then tell us what the evidence was on that. Now, you went through Annabelle. Now, let's go through Florenza. Correct. They met a few years earlier in 2004, and the same thing happened. He finds her in an isolated, vulnerable position, goes on a drive, professes ‑‑ Where was she from? I don't recall the exact village, Your Honor. But she was at a bus station in Oaxaca. She was there visiting a fair where she thought she was going to meet her boyfriend. And then out of nowhere comes our defendant. Was what that Annabelle? No, Annabelle was the college student that he met at a park. Okay, all right. Ms. Calixto was at a bus station in Oaxaca, left by her boyfriend, and along comes our defendant. They drive away. Within a few hours, he's suddenly saying, again, this story, you want to be my wife? By the end of the day, he's taken her almost to the same place that he later takes Ms. Adela Cruz, and leaves her there in his family's house. Don't talk to anybody. She starts getting lonely, and she's wondering what's going on. Then the first act of violence doesn't happen long thereafter. She went looking for him. This is at Executive Orders 67 to 70, found the defendant at home with another woman. He got mad, he hit her, he punched her, he dragged her down the stairs by her hair and threw her up against a table that had apparently a protruding nail. The second and third acts of violence, the second one is his Executive Record 116 to 117. She was upset that he wasn't spending enough time with her. She had one of her johns call him. He got mad, whipped her with the cord of an iron. And then at the same, around not long thereafter, she said something he didn't like. He went to hit her. She threatened to call the cops, and he stopped. This is Executive Record 118. And then thereafter, I think the record shows my opponent made it sound like, boy, she makes all the money in the world, and she can decide what she wants to do with it. I think the testimony showed she still had to give that all to Adrian. She was under his coercion in the United States.  But our theory is that when he sets up this pattern, that's his plan, scheme, or pattern. He doesn't deviate from that. And then she ends up prostituting within three or four days of arriving in the United States. How about the narrower question of persuading to come to the United States? Because you've got a conviction that he persuaded her to come to the United States, when it seems to me the evidence is exactly as was just described. She calls him. He resists. She persists, and he finally says yes. I think she persuaded rather than he persuaded. A couple points to that. He disputes that he was requiring her to repay the transportation costs. Right. This is my answer to this, Your Honor. He said, yeah, isn't that right? She denied that he told her that she had engaged in prostitution here to repay the travel costs. For Florence, yes. She denied that. She denied it. Right. Okay. So you've got a weaker case. Yeah, and I won't deny that, Your Honor, between the two of them. There's a few points there. First of all, to go back to the rapid. I don't think that the argument was based on how he was going to get her to come to the United States. I think that's the argument. Okay. So why don't you just pick up the chips you have that are any good and not worry about the rest of it? If that's how it ends up, Your Honor, I have no problem with that. Just let me go. That's my mandate. My mandate is to come here and try it. Can't you say how it's going to end up? Yeah, I could. You know, I'm having a, I got an argument. I was asked a question several questions back. I just want at least. That's a pretty bad argument. Well, everybody can laugh. Everybody can laugh. That's great. But at some point I would love to get a chance to answer the question. Thank you. Why don't you do that and then I've got a couple more for you. I figure some more are coming. All right. 2422. It has various acts in the disjunctive. Induce, entice. One of them is enticement. When you look at Raskowski, I'm reading a quote from page 1137 of that opinion. None of the statutory language requires Raskowski to have created out of whole cloth the woman's desire to go to the United States. It nearly, uses the word nearly, requires that he have convinced or influenced the victims to actually undergo the journey or made the possibility more appealing. Thus, it is not significant that two or several of the victims in that case have preexisting wishes to go to Russia or to leave Russia for the United States, especially considering that they never acted upon those desires until he made it attainable. Right. I get it that this may be a weak case for 2422 as to Florence. But all I'm saying is I read this as the law. Did our defendant make it more appealing for her to go? She never indicated that she could pay her own way over here. But what happened in the case of the language you're just reading from, they traveled to, the defendant traveled to Russia to say, would you please come. Now, they wanted to come, but they traveled to Russia to say, listen, we can make it possible. We're coming. They initiated. Here we've got her calling, say, can I come? And he says no. And then he eventually agrees to pay, Your Honor. Well. I don't know if that's a dispute. Sure, it sounds attractive. He eventually agrees to pay. But then on what condition? Are you paying me back out of your prostitution earnings? That doesn't sound like much of a deal. No, but all I'm saying is all he has to do is make the possibility more appealing. I got the argument. And one other thing, too. I got the argument. Hold on. I was just going to say with Florence, I think there's. Then the guy involved in that case, his name was Roshkovsky. Counsel, on the 1591 convictions on the force, fraud, and coercion element, reading your brief, with all due respect, was like playing the old shell game with worse of the P. And the P is force, fraud, and coercion. And you mouth that phrase a zillion times in the brief. But you never really come out and say what the force, fraud, and coercion is. Is it financial? Is it psychological? Is it physical restraining? Because you have a whole section of your brief arguing about how coercion is broader than a serious harm. But that only applies when physical restraint is used. And you never even allege that. So I'm totally baffled by what your actually theory is. That's where the fraud, force, and coercion in the United States was. I understand your argument about Mexico. But where in the United States was there force, fraud, or coercion? And which was it? Or is it a combination of it? You never really say it in your brief, do you? I thought I did. And it obviously disappoints me to hear that. I'm sorry. One of the reasons I did it, my opponent made a lot of assumptions from the get-go that I felt had to be dealt with. Well, turn to page 23 of your brief. And you tell me what that whole discussion does on the bottom part of the page. However, the statutory definition of coercion is broader. What does that have to do with this case? Because it seemed to me that one of the premises of my opponent was that everything had to be judged from a reasonable victim's point of view. The reason I pointed that out is because the definition of serious harm, it includes half of its components have that reasonable person compulsion, half don't. Yeah, but the other half don't apply to this case. So it's got nothing to do with anything in this case. In regards to physical, it only applies, it's only broader with regard to physical restraint. You haven't alleged physical restraint in this case, so it's got nothing to do with this case. I thought it was part of the evidence. One of the arguments that the prosecutor made below was, look, you have this evidence, these acts of violence. They're worried if they disregard this defense. You know, you're so damn stubborn. I thought we had come to an agreement that the period of offense is in the United States and there was no physical restraint in the United States. Is it correct? So? No evidence of it. But there needs to be a fear of it. If he has a plan of, you know, what Todd says is the defendant has to know a modus, established modus operandi will yield results for him in the future. So all I'm trying, I'm not trying to play games here. This is, you know, even Todd itself said this is one of the most awkwardly written federal statutes. And there's, you know, how will we know when it says will be used? Nobody can know knowledge of the future to an exact certainty. But again, Judge Gunder, I want to come back to that. I thought I laid out with the different victims, like one of the arguments was the financial harm. I mean, I thought I separated that out with, you know, that's at page 34. I gave, enumerated the different ways that somebody could find, as to Ms. Dela Cruz, that at least this coercion was part of the motivation. And then I also talk about this financial harm. But, I mean, I'm sorry. I could have done a better job, and I apologize for that. No, no, that's not an easy case. You do have coercion on the, what are they talking about, reimburse the $5,000.00. Because it falls within the, within one of our cases. Okay. Unless you have any more questions, I will. Thank you. All right. Thank you. Your Honors, I just have two quick points to make. And one is to address Judge Perkerson's, your interest in the financial harm. The government's argument is that there's financial harm because Mr. Zitlal-Popoca, or a threat of financial harm because Mr. Zitlal-Popoca said you need to pay back this smuggling fee. That may be a financial matter, but it's not a threat of financial harm. A threat of financial harm is something where you threaten to injure somebody's finances. I will empty your bank account. But this is just, I paid this money. You need to pay me back. If I say to my 3-year-old daughter, I took you to the zoo, you need to pay me back. That's a financial matter. It's not a threat of financial harm to her. Let me ask you this question. This is on the jury instruction. It does seem to me that the jury might have been misled in terms of what it could count in terms of the period of the offense and when the coercion had to take place. Did you make an objection to the jury instruction at the trial? Or were you, first off, were you the trial attorney? I was not, Your Honor. It was an objection made at trial to the jury instruction. There was an objection generally that I think that Bennett mentioned to the instruction and the nature of the instruction. But my recollection is, as to the specific dates, there was not a specific objection to that. And did you in your appeal, in your written appeal to us, say that there was something wrong with the jury instruction such that the jury didn't understand what they were supposed to decide? That's not one of the arguments in the appeal. Would you like to make one now? I think that it's, it is true looking back on what happened, that there was, the jury appeared to be confused about what time period that they were looking at. And I think defense counsel did point that out to the district court judge. But the district court judge, understandably so, I mean, I've been there, you don't want to go back and, you know, amend the instructions at the 11th hour. But that would have been preferable to the mess that we inherited. Right. Because the defense counsel did say, well, we've got a problem with these dates and what happened, the scope of the indictment. And then the solution was to just send the indictment back, I believe. Right, right. Without any guidance as to what the effect of that would be and what the effect of the dates were. That's right, Your Honor. And the arguments were made in the defense's closing argument that during this period there was no forced fraud or coercion. That has been consistently maintained throughout the defense in this case. Let me ask you again. Would you like to make an argument now on appeal that there was an improper jury instruction given such that the jury did not understand properly the period of the offense and what should be considered and in what fashion? I would be happy to make that argument now, Your Honor. Okay. And if... And you might object to it being made now. I understand. Okay. And if I may just make one final point, and it would be that what's interesting to me is that the government's trial theory below us, as we've discussed quite a bit, is that this love, this love is what made them do it. And that is what they argued below. That is the only thing they argued below. They say, the prosecutor in closing says, he actually gives up this violence theory. We see four new theories that the government has come up with on appeal. They actually take the government's trial theory, the prosecutor's theory below, and drop it like a hot potato. And now there's four new theories. But the prosecutor at closing argument actually said to the jury, you can motivate someone to move or act if you threaten them with violence. But if that's how you do it, it's probably not going to last more than once. If you convince them with love, you can convince them to do just about anything. And that's what he did here. They've conceded that this is their theory. And now they've dropped it again. And that's the point that I'd like to make. We're now looking at five theories. I think if this case were a play, you would call it three characters in search of a theory of liability. And I think that's a pretty important consideration. Let me ask you this. On this, when Annabelle was told that she'd have to go to work and raise that $5,000 so that, you that he used to pay the person who brought him across. You know what I'm talking about? She was told that she had to pay back money. Huh? Yes, she was told she would have to pay back. Had to pay the money. Now, in the past, when she was told that she had to go out to work and she had to raise certain sums of money for him. And if she failed, what would happen to her? She was not told that she had to raise certain sums of money. And she didn't have consequences because she was not told that she had to raise. The women in Todd, the victims in Todd, were told they had to work a certain number of hours and raise a certain amount of money. And in Todd, there's actual evidence that I think it was $900 a day or something like that. In that case, the defendant beat the women when they didn't raise the right amount of money. And here, we don't have that. Didn't he tell her that it cost $5,000 and he expected her to raise it? Were words to that effect? I think it was something closer to $1,500. And he said, you need to pay me back. That's what he said to her? That's not the exact words. But it was something to the effect of, you need to pay me back. So she knew or had to know from past experience that she did not obey him, that there'd be consequences. Once again, there were instances of violence between Mr. Zalapopoca and Ms. de la Cruz, and they did not concern prostitution. Not one instance concerned prostitution. Every instance happened, again, in Mexico and not in the United States. All right. You're going to make your jury instruction argument? I would make the argument as Judge Fletcher, I mean, as Judge Fletcher proposed. So it's plain error by jurisdiction? It can be raised at any time? I hope so. I mean, if I haven't done something that I should have done, it's on behalf of my client. I have to say flatly, what troubles me about this case is that it's a close question to me as to whether or not there's coercion within the meaning of the statute after the arrival in the United States. And I am concerned that the jury didn't understand precisely the question in front of them. And I think the evidence can go either way, frankly, in front of a jury. But I don't think they understood that that was the question. Okay. Thank you.
judges: Bennett, Pregerson, Fletcher